IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON/GREENWOOD DIVISION

Melanie Jane Tyre,                    )      Civil Action No.  8:14-cv-03426-JDA
                                      )
                    Plaintiff,        )      **ORDER**
                                      )
            vs.                       )
                                      )
Carolyn W. Colvin,                    )
Commissioner of Social Security,      )
                                      )
                    Defendant.        )

This matter is before the Court for a final Order pursuant to Local Civil Rules 73.02(B)(1) and 83.VII.02, D.S.C.; 28 U.S.C. § 636(c); the parties' consent to disposition by a Magistrate Judge [Doc. 9]; and the Order of reference signed by the Honorable Timothy M. Cain on September 18, 2014 [Doc. 10].  Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to obtain judicial review of a final decision of the Commissioner of Social Security ("the Commissioner"), denying Plaintiff's claim for supplemental security income ("SSI").[1]  For the reasons set forth below, the decision of the Commissioner is affirmed.

**PROCEDURAL HISTORY**

On April 28, 2011, Plaintiff filed an application for SSI, alleging disability beginning October 1, 2009.  [R. 96–102.]  The claim was denied initially and upon reconsideration by the Social Security Administration ("the Administration").  [R. 82–85, 89–90.]  Plaintiff

---

[1]Section 1383(c)(3) provides, "The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title."  42 U.S.C. § 1383(c)(3).

filed a request for hearing before an administrative law judge ("ALJ"), and on November 16, 2012, ALJ John S. Lamb held a hearing on Plaintiff's claims. [R. 39–76.]

On April 12, 2013, the ALJ issued his decision, finding Plaintiff not disabled. [R. 12–34.] At Step 1[2], the ALJ found Plaintiff has not engaged in substantial gainful activity since April 28, 2011, the application date. [R. 14, Finding 1.] At Step 2, the ALJ found Plaintiff had severe impairments of obesity, migraine headaches, major depressive disorder, borderline intellectual functioning, anxiety disorder, borderline personality disorder, respiratory system impairment, and fibromyalgia. [R. 14, Finding 2.] The ALJ also noted numerous non-severe impairments that have not significantly affected Plaintiff's work related activities including: bronchitis, scabies, elbow strain (with normal X-rays), sinusitis, acute asthmatic bronchitis and upper respiratory infection (with negative chest X-ray), right flank pain with no ureteral stone, possible abnormal uterus, normal rib X-rays and normal pelvic sonogram; allergic reaction; bronchitis with hemoptysis with normal chest X-ray; angioedema (facial swelling) with normal CT of neck; allergic reaction, angioedema, abdominal pain, pneumonia, minor elbow injury diagnosed as strain/sprain/bursitis, urinary tract infection, neck strain, staph skin infection, back pain/right flank pain with normal CT, and urinary tract infection; perirectal/perineal abscess and angioedema, costochondritis gastroenteritis and abdominal pain; indigestion, gastritis, ovarian cyst and pelvic inflammatory disease; acute pancreatitis and dehydration; "COPD on CPAP at night"; non-displaced ankle fracture; history of hypothyroidism with nodules; cervicalgia, status past auto accident; pneumonia; hemorrhoids; vaginitis, acute pharyngitis, abdominal

---

[2]The five-step sequential analysis used to evaluate disability claims is discussed in the Applicable Law section, *infra*.

nodule and hyperglycemia; hypothyroidism, urinary tract infection and reflux esophagitis; cellulitis/abscess of breast, upper respiratory infection, chronic mycotic otitis externa, reflux and transient insomnia; post cholecystectomy syndrome; and acute pancreatitis, hyperlipidemia, hypothyroidism and ovarian cyst; dysuria and dyshiidemia. [R. 14–16.]

At Step 3, the ALJ determined Plaintiff's impairments or combination of impairments do not meet or medically equal the severity of one of the listed impairments. [R. 16, Finding 3.] The ALJ specifically considered Listings 3.02, 12.03, 12.04, 12.05, 12.06, 12.08 and 12.09, and also considered SSR 02-01p. [R. 16–23.]

Before addressing Step 4, Plaintiff's ability to perform her past relevant work, the ALJ found that Plaintiff retained the following residual functional capacity ("RFC"):

> After careful consideration of the entire record, I find that the claimant has the RFC to perform sedentary work as defined in 20 CFR 416.967(b) except for the following additional limitations: occasional climbing of ladders/ropes/scaffolds; a need to avoid concentrated exposure to dust, flumes, odors, gases or pulmonary irritants; and a limitation to simple, routine, repetitive tasks with no ongoing public contact and with low stress, defined as only occasional change in work setting or decision making.

[R. 23, Finding 4.]   Based on this RFC, at Step 4, the ALJ determined Plaintiff was unable to perform any past relevant work; however, based on her age, education, work experience, RFC, and testimony of a vocational expert ("VE"), the ALJ found that there were jobs that exist in significant numbers in the national economy that the Plaintiff could perform. [R. 33, Finding 9.] Thus, the ALJ found Plaintiff had not been under a disability, as defined in the Act, since April 28, 2011, the date the application was filed. [R. 34.]

Plaintiff filed a request for review of the ALJ's decision with the Appeals Council [R. 7], which denied review on July 11, 2013 [R. 1–6]. Plaintiff commenced an action for judicial review in this Court on August 25, 2014. [Doc. 1.]

## THE PARTIES' POSITIONS

Plaintiff contends the ALJ's decision is not supported by substantial evidence and contains multiple legal and factual errors warranting the reversal and remand of the case. [Doc. 15.] Specifically, Plaintiff contends the ALJ erred in finding that her impairments did not meet Listing 12.05C [*id*. at 4–6]; failed to properly evaluate the opinion of Plaintiff's treating physician Dr. Travis Davis ("Dr. Davis") [*id*. at 6–7]; and erred in finding Plaintiff capable of sedentary work in light of the testimony of the VE [*id*. at 7–9] .

The Commissioner contends the ALJ's decision should be affirmed because the decisions is supported by substantial evidence and is free from reversible legal error. [Doc. 17.] Specifically, the Commissioner contends the ALJ reasonably found Plaintiff did not meet Listing 12.05C because she failed to prove that she met the diagnostic criteria of the listing [*id*. at 16–19]; properly evaluated the opinion of Plaintiff's treating physician Dr. Davis [*id*. at 20–22]; and properly included only credibly established limitations in his hypothetical to the VE [*id*. at 22–24].

## STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla—i.e., the evidence must do more than merely create a suspicion of the existence of a fact and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting

4

*Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citing *Woolridge v. Celebrezze*, 214 F. Supp. 686, 687 (S.D.W. Va. 1963)) ("Substantial evidence, it has been held, is evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'").

Where conflicting evidence "allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)," not on the reviewing court.  *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996); *see also  Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991) (stating that where the Commissioner's decision is supported by substantial evidence, the court will affirm, even if the reviewer would have reached a contrary result as finder of fact and even if the reviewer finds that the evidence preponderates against the Commissioner's decision).  Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment for that of the Commissioner so long as the decision is supported by substantial evidence. *See Bird v. Commissioner*, 699 F.3d 337, 340 (4th Cir. 2012); *Laws*, 368 F.2d at 642; *Snyder v. Ribicoff*, 307 F.2d 518, 520 (4th Cir. 1962).

The reviewing court will reverse the Commissioner's decision on plenary review, however, if the decision applies incorrect law or fails to provide the court with sufficient reasoning to determine that the Commissioner properly applied the law.  *Myers v. Califano,* 611 F.2d 980, 982 (4th Cir. 1980); *see also Keeton v. Dep't of Health & Human Servs.*, 21

F.3d 1064, 1066 (11th Cir. 1994). Where the Commissioner's decision "is in clear disregard of the overwhelming weight of the evidence, Congress has empowered the courts to modify or reverse the [Commissioner's] decision 'with or without remanding the cause for a rehearing.'" *Vitek v. Finch*, 438 F.2d 1157, 1158 (4th Cir. 1971) (quoting 42 U.S.C. § 405(g)). Remand is unnecessary where "the record does not contain substantial evidence to support a decision denying coverage under the correct legal standard and when reopening the record for more evidence would serve no purpose." *Breeden v. Weinberger*, 493 F.2d 1002, 1012 (4th Cir. 1974).

The court may remand a case to the Commissioner for a rehearing under sentence four or sentence six of 42 U.S.C. § 405(g). *Sargent v. Sullivan*, 941 F.2d 1207 (4th Cir. 1991) (unpublished table decision). To remand under sentence four, the reviewing court must find either that the Commissioner's decision is not supported by substantial evidence or that the Commissioner incorrectly applied the law relevant to the disability claim. *See, e.g.*, *Jackson v. Chater*, 99 F.3d 1086, 1090–91 (11th Cir. 1996) (holding remand was appropriate where the ALJ failed to develop a full and fair record of the claimant's residual functional capacity); *Brehem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (holding remand was appropriate where record was insufficient to affirm but was also insufficient for court to find the claimant disabled). Where the court cannot discern the basis for the Commissioner's decision, a remand under sentence four is usually the proper course to allow the Commissioner to explain the basis for the decision or for additional investigation. *See Radford v. Commissioner*, 734 F.3d 288, 295 (4th Cir. 2013) (quoting *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985); *see also Smith v. Heckler*, 782 F.2d 1176, 1181–82 (4th Cir. 1986) (remanding case where decision of ALJ contained "a gap in its

6

reasoning" because ALJ did not say he was discounting testimony or why); *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984) (remanding case where neither the ALJ nor the Appeals Council indicated the weight given to relevant evidence). On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence. *See Smith*, 782 F.2d at 1182 ("The [Commissioner] and the claimant may produce further evidence on remand."). After a remand under sentence four, the court enters a final and immediately appealable judgment and then loses jurisdiction. *Sargent*, 941 F.2d 1207 (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 102 (1991)).

In contrast, sentence six provides:

> The court may . . . at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . . .

42 U.S.C. § 405(g). A reviewing court may remand a case to the Commissioner on the basis of new evidence only if four prerequisites are met: (1) the evidence is relevant to the determination of disability at the time the application was first filed; (2) the evidence is material to the extent that the Commissioner's decision might reasonably have been different had the new evidence been before him; (3) there is good cause for the claimant's failure to submit the evidence when the claim was before the Commissioner; and (4) the claimant made at least a general showing of the nature of the new evidence to the reviewing court. *Borders v. Heckler*, 777 F.2d 954, 955 (4th Cir. 1985) (citing 42 U.S.C. § 405(g); *Mitchell v. Schweiker*, 699 F.2d 185, 188 (4th Cir. 1983); *Sims v. Harris*, 631 F.2d 26, 28 (4th Cir. 1980); *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979)), *superseded by amendment to statute*, 42 U.S.C. § 405(g), *as recognized in Wilkins v. Sec'y, Dep't of*

7

*Health & Human Servs.*, 925 F.2d 769, 774 (4th Cir. 1991).[3]  With remand under sentence

six, the parties must return to the court after remand to file modified findings of fact.

*Melkonyan*, 501 U.S. at 98.  The reviewing court retains jurisdiction pending remand and

does not enter a final judgment until after the completion of remand proceedings.  *See*

*Allen v. Chater*, 67 F.3d 293 (4th Cir. 1995) (unpublished table decision) (holding that an

order remanding a claim for Social Security benefits pursuant to sentence six of 42 U.S.C.

§ 405(g) is not a final order).

## APPLICABLE LAW

The Act provides that disability benefits shall be available to those persons insured

for benefits, who are not of retirement age, who properly apply, and who are under a

disability.  42 U.S.C. § 423(a).  "Disability" is defined as:

> the inability to engage in any substantial gainful activity by
> reason of any medically determinable physical or mental
> impairment which can be expected to result in death or which
> has lasted or can be expected to last for a continuous period
> of not less than 12 consecutive months.

*Id.* § 423(d)(1)(A).

---

[3]Though the court in *Wilkins* indicated in a parenthetical that the four-part test set forth
in *Borders* had been superseded by an amendment to 42 U.S.C. § 405(g), courts in the
Fourth Circuit have continued to cite the requirements outlined in *Borders* when evaluating
a claim for remand based on new evidence.  *See, e.g.*, *Brooks v. Astrue*, No. 6:10-cv-152,
2010 WL 5478648, at *8 (D.S.C. Nov. 23, 2010); *Ashton v. Astrue*, No. TMD 09-1107,
2010 WL 3199345, at *3 (D. Md. Aug. 12, 2010); *Washington v. Comm'r of Soc. Sec.*, No.
2:08-cv-93, 2009 WL 86737, at *5 (E.D. Va. Jan. 13, 2009); *Brock v. Sec'y of Health &
Human Servs.*, 807 F. Supp. 1248, 1250 n.3 (S.D.W. Va. 1992).  Further, the Supreme
Court of the United States has not suggested *Borders*' construction of § 405(g) is incorrect.
*See Sullivan v. Finkelstein*, 496 U.S. 617, 626 n.6 (1990).  Accordingly, the Court will apply
the more stringent *Borders* inquiry.

## I.     The Five Step Evaluation

To facilitate uniform and efficient processing of disability claims, federal regulations have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g.*, *Heckler v. Campbell*, 461 U.S. 458, 461 n.2 (1983) (noting a "need for efficiency" in considering disability claims). The ALJ must consider whether (1) the claimant is engaged in substantial gainful activity; (2) the claimant has a severe impairment; (3) the impairment meets or equals an impairment included in the Administration's Official Listings of Impairments found at 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) the impairment prevents the claimant from performing past relevant work; and (5) the impairment prevents the claimant from having substantial gainful employment. 20 C.F.R. § 416.920. Through the fourth step, the burden of production and proof is on the claimant. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983). The claimant must prove disability on or before the last day of her insured status to receive disability benefits. *Everett v. Sec'y of Health, Educ. & Welfare*, 412 F.2d 842, 843 (4th Cir. 1969). If the inquiry reaches step five, the burden shifts to the Commissioner to produce evidence that other jobs exist in the national economy that the claimant can perform, considering the claimant's age, education, and work experience. *Grant*, 699 F.2d at 191. If at any step of the evaluation the ALJ can find an individual is disabled or not disabled, further inquiry is unnecessary. 20 C.F.R. § 416.920(a)(4); *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981).

### A.    *Substantial Gainful Activity*

"Substantial gainful activity" must be both substantial—involves doing significant physical or mental activities, 20 C.F.R. § 416.972(a)—and gainful—done for pay or profit, whether or not a profit is realized, *id.* § 416.972(b).   If an individual has earnings from employment or self-employment above a specific level set out in the regulations, he is generally presumed to be able to engage in substantial gainful activity.  *Id.* § 416.974–.975.

### B.    *Severe Impairment*

An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities.  *See id.* § 416.921.  When determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments.  42 U.S.C. §§ 423(d)(2)(B), 1382c(a)(3)(G).  The ALJ must evaluate a disability claimant as a whole person and not in the abstract, having several hypothetical and isolated illnesses.  *Walker v. Bowen*, 889 F.2d 47, 49–50 (4th Cir. 1989) (stating that, when evaluating the effect of a number of impairments on a disability claimant, "the [Commissioner] must consider the combined effect of a claimant's impairments and not fragmentize them").  Accordingly, the ALJ must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled.   *Id.* at 50 ("As a corollary to this rule, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments.").  If the ALJ finds a combination of impairments to be severe, "the combined impact of the

impairments shall be considered throughout the disability determination process." 42 U.S.C. §§ 423(d)(2)(B), 1382c(a)(3)(G).

### C. *Meets or Equals an Impairment Listed in the Listings of Impairments*

If a claimant's impairment or combination of impairments meets or medically equals the criteria of a listing found at 20 C.F.R. Pt. 404, Subpt. P, App.1 and meets the duration requirement found at 20 C.F.R. § 416.909, the ALJ will find the claimant disabled without considering the claimant's age, education, and work experience.[4]    20 C.F.R. § 416.920(a)(4)(iii), (d).

### D. *Past Relevant Work*

The assessment of a claimant's ability to perform past relevant work "reflect[s] the statute's focus on the functional capacity retained by the claimant." *Pass v. Chater*, 65 F.3d 1200, 1204 (4th Cir. 1995). At this step of the evaluation, the ALJ compares the claimant's residual functional capacity[5] with the physical and mental demands of the kind of work he has done in the past to determine whether the claimant has the residual functional capacity to do his past work. 20 C.F.R. § 416.960(b).

### E. *Other Work*

As previously stated, once the ALJ finds that a claimant cannot return to her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could

---

[4]The Listing of Impairments is applicable to SSI claims pursuant to 20 C.F.R. §§ 416.911, 416.925.

[5]Residual functional capacity is "the most [a claimant] can still do despite [his] limitations." 20 C.F.R. § 416.945(a)(1).

perform other work that exists in the national economy. *See* 20 C.F.R. § 416.920(f)–(g); *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). To meet this burden, the Commissioner may sometimes rely exclusively on the Medical-Vocational Guidelines (the "grids"). Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant nonexertional factors.[6] 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(e); *Gory v. Schweiker*, 712 F.2d 929, 930–31 (4th Cir. 1983) (stating that exclusive reliance on the grids is appropriate in cases involving exertional limitations). When a claimant suffers from both exertional and nonexertional limitations, the grids may serve only as guidelines. *Gory*, 712 F.2d at 931. In such a case, the Commissioner must use a vocational expert to establish the claimant's ability to perform other work. 20 C.F.R. § 416.969a; *see Walker*, 889 F.2d at 49–50 ("Because we have found that the grids cannot be relied upon to show conclusively that claimant is not disabled, when the case is remanded it will be incumbent upon the [Commissioner] to prove by expert vocational testimony that despite the combination of exertional and nonexertional impairments, the claimant retains the ability to perform specific jobs which exist in the national economy."). The purpose of using a vocational expert is "to assist the ALJ in determining whether there is work available in the national economy which this

---

[6]An exertional limitation is one that affects the claimant's ability to meet the strength requirements of jobs. 20 C.F.R. § 416.969a(a). A nonexertional limitation is one that affects the ability to meet the demands of the job other than the strength demands. *Id.* Examples of nonexertional limitations include but are not limited to difficulty functioning because of being nervous, anxious, or depressed; difficulty maintaining attention or concentrating; difficulty understanding or remembering detailed instructions; difficulty seeing or hearing. 20 C.F.R. § 416.969a(c)(1).

particular claimant can perform." *Walker*, 889 F.2d at 50. For the vocational expert's testimony to be relevant, "it must be based upon a consideration of all other evidence in the record, . . . and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments." *Id.* (citations omitted).

## II.    Developing the Record

The ALJ has a duty to fully and fairly develop the record. *See Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986). The ALJ is required to inquire fully into each relevant issue. *Snyder*, 307 F.2d at 520. The performance of this duty is particularly important when a claimant appears without counsel. *Marsh v. Harris*, 632 F.2d 296, 299 (4th Cir. 1980). In such circumstances, "the ALJ should scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts, . . . being especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited." *Id.* (internal quotations and citations omitted).

## III.   Treating Physicians

If a treating physician's opinion on the nature and severity of a claimant's impairments is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record, the ALJ must give it controlling weight. 20 C.F.R. § 416.927(c)(2); *see Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). The ALJ may discount a treating physician's opinion if it is unsupported or inconsistent with other evidence, i.e., when the treating physician's opinion does not warrant controlling weight, *Craig*, 76 F.3d at 590, but the ALJ must nevertheless

assign a weight to the medical opinion based on the 1) length of the treatment relationship and the frequency of examination; 2) nature and extent of the treatment relationship; 3) supportability of the opinion; 4) consistency of the opinion with the record a whole; 5) specialization of the physician; and 6) other factors which tend to support or contradict the opinion, 20 C.F.R. § 416.927(c).  Similarly, where a treating physician has merely made conclusory statements, the ALJ may afford the opinion such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. *See Craig*, 76 F.3d at 590 (holding there was sufficient evidence for the ALJ to reject the treating physician's conclusory opinion where the record contained contradictory evidence).

In any instance, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion.  *See Mitchell v. Schweiker*, 699 F.2d 185, 187 (4th Cir. 1983) (stating that treating physician's opinion must be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition for a prolonged period of time"); 20 C.F.R. § 416.927(c)(2).  An ALJ determination coming down on the side of a non-examining, non-treating physician's opinion can stand only if the medical testimony of examining and treating physicians goes both ways.  *Smith v. Schweiker*, 795 F.2d 343, 346 (4th Cir. 1986).  Further, the ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled.  20 C.F.R. § 416.927(d).  However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability.  *Id.*

14

## IV.     Medical Tests and Examinations

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled.  20 C.F.R. § 416.917; *see also Conley v. Bowen*, 781 F.2d 143, 146 (8th Cir. 1986).  The regulations are clear: a consultative examination is not required when there is sufficient medical evidence to make a determination on a claimant's disability.  20 C.F.R. § 416.917.  Under the regulations, however, the ALJ may determine that a consultative examination or other medical tests are necessary.  *Id.*

## V.     Pain

Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical impairment that could reasonably be expected to produce the pain or symptoms alleged.  42 U.S.C. § 423(d)(5)(A).  In evaluating claims of disabling pain, the ALJ must proceed in a two-part analysis.  *Morgan v. Barnhart,* 142 F. App'x 716, 723 (4th Cir. 2005) (unpublished opinion).  First, "the ALJ must determine whether the claimant has produced medical evidence of a 'medically determinable impairment which could reasonably be expected to produce . . . the actual pain, in the amount and degree, alleged by the claimant.'"  *Id.* (quoting *Craig*, 76 F.3d at 594).  Second, "if, and only if, the ALJ finds that the claimant has produced such evidence, the ALJ must then determine, as

15

a matter of fact, whether the claimant's underlying impairment *actually* causes her alleged pain." *Id.* (emphasis in original) (citing *Craig*, 76 F.3d at 595).

Under the "pain rule" applicable within the United States Court of Appeals for the Fourth Circuit, it is well established that "subjective complaints of pain and physical discomfort could give rise to a finding of total disability, even when those complaints [a]re not supported fully by objective observable signs." *Coffman v. Bowen*, 829 F.2d 514, 518 (4th Cir. 1987) (citing *Hicks v. Heckler*, 756 F.2d 1022, 1023 (4th Cir. 1985)). The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence. 20 C.F.R. § 416.928. Indeed, the Fourth Circuit has rejected a rule which would require the claimant to demonstrate objective evidence of the pain itself, *Jenkins v. Sullivan*, 906 F.2d 107, 108 (4th Cir. 1990), and ordered the Commissioner to promulgate and distribute to all administrative law judges within the circuit a policy stating Fourth Circuit law on the subject of pain as a disabling condition, *Hyatt v. Sullivan*, 899 F.2d 329, 336–37 (4th Cir. 1990). The Commissioner thereafter issued the following "Policy Interpretation Ruling":

> This Ruling supersedes, only in states within the Fourth Circuit (North Carolina, South Carolina, Maryland, Virginia and West Virginia), Social Security Ruling (SSR) 88-13, Titles II and XVI: Evaluation of Pain and Other Symptoms:
>
> ...
>
> **FOURTH CIRCUIT STANDARD:** Once an underlying physical or [m]ental impairment that could reasonably be expected to cause pain is shown by medically acceptable objective evidence, such as clinical or laboratory diagnostic techniques, the adjudicator must evaluate the disabling effects

16

> of a disability claimant's pain, even though its intensity or severity is shown only by subjective evidence. If an underlying impairment capable of causing pain is shown, subjective evidence of the pain, its intensity or degree can, by itself, support a finding of disability. Objective medical evidence of pain, its intensity or degree (i.e., manifestations of the functional effects of pain such as deteriorating nerve or muscle tissue, muscle spasm, or sensory or motor disruption), if available, should be obtained and considered. Because pain is not readily susceptible of objective proof, however, the absence of objective medical evidence of the intensity, severity, degree or functional effect of pain is not determinative.

SSR 90-1p, 55 Fed. Reg. 31,898-02, at 31,899 (Aug. 6, 1990). SSR 90-1p has since been superseded by SSR 96-7p, which is consistent with SSR 90-1p. *See* SSR 96-7p, 61 Fed. Reg. 34,483-01 (July 2, 1996). SSR 96-7p provides, "If an individual's statements about pain or other symptoms are not substantiated by the objective medical evidence, the adjudicator must consider all of the evidence in the case record, including any statements by the individual and other persons concerning the individual's symptoms." *Id.* at 34,485; *see also* 20 C.F.R. § 416.929(c)(1)–(c)(2) (outlining evaluation of pain).

## VI.    Credibility

The ALJ must make a credibility determination based upon all the evidence in the record. Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. *Hammond v. Heckler*, 765 F.2d 424, 426 (4th Cir. 1985). Although credibility determinations are generally left to the ALJ's discretion, such determinations should not be sustained if they are based on improper criteria. *Breeden*, 493 F.2d at 1010 ("We recognize that the administrative law judge has the unique advantage of having heard the testimony firsthand, and ordinarily we may not disturb

credibility findings that are based on a witness's demeanor. But administrative findings based on oral testimony are not sacrosanct, and if it appears that credibility determinations are based on improper or irrational criteria they cannot be sustained.").

## APPLICATION AND ANALYSIS

### Listing 12.05C

Plaintiff contends the ALJ erred by failing to find that the severity of Plaintiff's mental impairments met or equaled Listing 12.05C. Plaintiff argues the ALJ erred because, contrary to his findings, the listing "does not require a doctor to have diagnosed the claimant using the term 'mental retardation.'" [Doc. 15 at 4.] Plaintiff also contends the she meets the listing because she has a Full Scale IQ of 70 with a working memory score of 63 and there is no evidence that her IQ changed; and, furthermore, the fact that she can barely read or write is "'a clear "manifestation" of mental retardation occurring before age twenty-two.'" [*Id*. at 5.] The Plaintiff also points out the fact that the ALJ found Plaintiff has other severe impairments, which further supports her disability under the listing. [*Id*. at 5–6.]

The Commissioner argues the Plaintiff failed to meet her burden of proving that she met Listing 12. 05C. The Commissioner points out that Plaintiff failed to show evidence of deficits of adaptive functioning before age 22 and that the ALJ clearly explained his reasoning for finding that she failed to meet this burden. [Doc. 17 at 16–18.] The Commissioner contends that ALJ did not err in considering Plaintiff's activities of daily living or her work history as evidence of her adaptive functioning. [*Id*. at 18–19.]

***Criteria of Listing 12.05C***

To determine whether a claimant's impairments meet or equal a listed impairment, the ALJ identifies the relevant listed impairments and compares the listing criteria with the evidence of the claimant's symptoms. *See Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986) (stating that without identifying the relevant listings and comparing the claimant's symptoms to the listing criteria, "it is simply impossible to tell whether there was substantial evidence to support the determination"); *Gilbert v. Colvin*, C/A No. 8:13-1561-JFA-JDA, 2014 WL 4809923, at *12 (D.S.C. Sept. 26, 2014) (explaining that where there is "'ample factual support in the record' for a particular listing, the ALJ must provide a full analysis to determine whether the claimant's impairment meets or equals" it.) (citations omitted).

Listing 12.05C reads as follows:

> Intellectual disability: Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> . . .
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 *and a physical or other mental impairment imposing an additional and significant work-related limitation of function;*
>
> . . . .

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05 (emphasis added).[7]

---

[7]The language in Listing 12.05 changed from mental retardation to intellectual disability on September 3, 2013. SSA-1012-0066, 78 FR 46499 (Aug. 1, 2013). Therefore, some of Plaintiff's documentation use mental retardation and some use intellectual disability.

19

To meet Listing 12.05, a claimant must satisfy the "diagnostic description" in the introductory paragraph and any one of the four sets of criteria—A, B, C, or D. *Id.* § 12.00A. The diagnostic description describes mental retardation as "significantly sub-average general intellectual functioning with deficits in adaptive functioning." *Id.* § 12.05. The Administration "has never adopted a standard of measurement for the term 'deficits in adaptive functioning' in the capsule definition of Listing 12.05." *Wall v. Astrue*, 561 F.3d 1048, 1073 (10th Cir. 2009) (Holloway, J., dissenting). The Administration has noted that the definition of mental retardation in its Listings is "consistent with, if not identical to, the definitions of [mental retardation] used by the leading professional organizations."[8] Technical Revisions to Medical Criteria for Determinations of Disability, 67 Fed. Reg. 20,018-01, 20,022 (Apr. 24, 2002). *But see Cox v. Astrue*, 495 F.3d 614, 618 n.4 (8th Cir. 2007) (noting that "the medical standard for mental retardation is not identical to the legal standard"). Medical professional organizations have stated that deficits in "adaptive functioning" can include limitations in areas such as communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic

---

[8]The Administration explained that, in the United States, each of the four major professional organizations has its own definition. Technical Revisions to Medical Criteria for Determinations of Disability, 67 Fed. Reg. 20,018-01, 20,022 (Apr. 24, 2002). However, although each requires "significant deficits in intellectual functioning," which is evidenced by low IQ scores, "age of onset and the method of measuring the required deficits in adaptive functioning differ among the organizations." *Id.* Moreover, the Administration has discussed the definitions utilized by the American Psychiatric Association but has specifically stated that it endorses no organization's methodology over another. *Id.* In fact, when the Administration revised the listings in 2002, it declined a proposal to incorporate the American Psychiatric Association definition of mental retardation into Listing 12.05. *Id.* The Administration's definition "establishes the necessary elements, while allowing use of any of the measurement methods recognized and endorsed by the professional organizations." *Id.*

skills, work, leisure, health, and safety. *Atkins v. Virginia*, 536 U.S. 304, 309 n.3 (2002) (quoting American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 41 (4th ed., Text Revision 2000) ("DSM-IV-TR") (noting the similarity between the American Association on Mental Retardation and the American Psychiatric Association's definitions of mental retardation[9]).  Further, in addition to producing deficits in adaptive functioning, the claimant's mental retardation must have "initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22."[10]  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.

In addition to showing deficits in adaptive functioning prior to age 22, to meet the criteria of 12.05C, the claimant must establish he has an IQ between 60 and 70 and "a physical or other mental impairment imposing an additional and significant work-related limitation of function." *Id.* § 12.05C.  The presence of a significant work-related limitation of function that renders the claimant unable to perform his past relevant work satisfies the "additional and significant" requirement of Listing 12.05C.  *Rainey v. Heckler*, 770 F.2d 408, 410–11 (4th Cir. 1985).

---

[9]The Fourth Circuit Court of Appeals has approved the use of the American Association of Mental Retardation's standards for measuring adaptive skills in reviewing the denial of a writ of habeas corpus under 28 U.S.C. § 2254.  *See Green v. Johnson*, 515 F.3d 290, 302 (4th Cir. 2008), *cert. denied*, 128 S. Ct. 2999 (2008) (finding Virginia Supreme Court's determination that the petitioner had failed to show he was mentally retarded was not contrary to clearly established federal law).

[10]Medically, a diagnosis of mental retardation requires a finding that the patient's intellectual limitations began in childhood.  DSM-IV-TR, supra, at 54.

As discussed below, the ALJ properly explained his consideration of the evidence and his conclusion that Plaintiff failed to prove the existence of deficits in adaptive functioning prior to the age of 22.

### The ALJ's Decision

Although the ALJ evaluated Plaintiff's mental impairment under Listing 12.05 paragraphs (A)-(D), Plaintiff only challenges the ALJ's findings with respect to Listing 12.05C. In evaluating Plaintiff's mental impairments under Listing 12.05C, the ALJ explained as follows:

> I have also considered her mental impairment under listing12.05. Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> Dr. Harper diagnosed borderline intellectual functioning. On the WAIS-IV, claimant obtained a VCI of 76,-PRI of79 and Full Scale IQ of 70. I note that Dr. Harper did not diagnose mental retardation and instead concluded that intellectual functioning probably fell within the borderline range based on educational and vocational history. I also note that the diagnosis of mental retardation does not appear elsewhere in the record.
>
> To determine whether a claimant had deficits in adaptive functioning prior to age 22, I must consider various· factors of adaptive functioning.
>
> There is minimal evidence that claimant has deficits in communication. She is able to convey information from others, convey information to others, understand what she- is told and express herself through words or actions.
>
> Evidence as to activities of daily living shows that claimant has intact self-care and home living skills. She is able to navigate through everyday situations involving grooming and feeding, and can independently perform living skills.

As to social skills, she retains basic ability to interact with others, as evidence by discussion of social functioning in the "B" criteria evaluation.

She is able to use community resources adequately and to navigate through situations by using the means provided by the community. She has made frequent visits to the ER, has obtained treatment from private physicians and has gone to mental health treatment, all without significant assistance.

She maintains ability for self-direction and can complete day-to-day tasks without guidance.

As to functional academic skills, she is able to apply academic skills to everyday situations. She has a history of work ma manufacturing setting and is able to follow directions. She can understand labels on food and drug containers. She told Dr. Harper that she dropped out of school m the tenth grade. She repeated some grades, but this was because she missed too many days of school due to health issues. She failed the eighth grade. She said she was in special education classes and reported a history of learning difficulties in school; however, she admitted that she was never treated with medication for attention problems and I find no such diagnosis in medical records.  She has not submitted school records documenting that she was in special education classes. She is not illiterate and testing by Dr. Harper shows that has basic academic skills for reading and math.

As to work history, she has maintained gainful employment in the past. She told Dr. Harper that she last worked in October 2009 in a restaurant doing food preparation. She worked only two months, but the reason she left the job was because the business closed. Before that, she worked on an assembly line for Ryobi for three months. She stopped working there because she was arrested for failing to pay a DUI fine. Her longest job was when she ran a spinner at a textile mill and she did that for three years.

Her earnings record shows that she had earnings that were near or just below the level of substantial gainful activity in 1997 from Alice Manufacturing. She had earnings that were above the level of substantial gainful activity in 2001 from Alice Manufacturing and from self employment (Exhibit 3D).

As to leisure, she is involved in relaxing activities. As to health issues, she has made regular visits to doctors and mental health and has utilized the resources of the ER. As to safety, she is able to recognize dangerous situations and avoid hazards.

Considering this evidence as to adaptive functioning and the fact that she has not had a diagnosis of mental retardation, I find that the impairment of borderline intellectual functioning does not meet the requirements of listing 12.05.
. . .

The requirements in 12.05C are not met because the claimant does not have a diagnosis of mental retardation (as required in the first part of the listing) with a valid verbal, performance or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

[R. 21–23.]

### Analysis

Plaintiff argues that the fact that she "experienced difficulties reading, and in fact, dropped out of school before 9th grade because she had reading problems, is a manifestation of low IQ before the age of 22." [Doc. 15 at 5.] Plaintiff also argues that the ALJ impermissible used her work experience against her to prove non-disability. [*Id.*] However, upon review, the Court finds the Plaintiff's reading of the case law interpreting Listing 12.05C's parameters to be overly broad.

The case law shows that the issue of whether a claimant manifested deficits in adaptive functioning during the developmental period is a fact-specific inquiry with few bright-line rules. *Accord Salmons v. Astrue*, No. 5:10-cv-195-RLV, 2012 WL 1884485, at *5 (W.D.N.C. May 23, 2012). Cases interpreting Listing 12.05 provide some parameters for an ALJ's conclusion on this issue. *Compare Hancock v. Astrue*, 667 F.3d 470, 475–76

24

(4th Cir. 2012) (affirming Commissioner's determination that claimant did not have the requisite deficits in adaptive functioning where the claimant had worked as a battery assembler and a drop clipper; performed tasks such as shopping, paying bills, and making change; took care of three small grandchildren at level acceptable to the State Department of Social Services; did a majority of the household chores, attended school to obtain a General Equivalency Diploma; and did puzzles for entertainment) with *Rivers v. Astrue*, No. 8:10-cv-314-RMG, 2011 WL 2581447 (D.S.C. June 28, 2011) (reversing finding of no deficits in adaptive functioning where claimant was functionally illiterate, showed poor academic performance with multiple IQ tests in or before the third grade showing scores in the 50s, and dropped out of school in the ninth grade). Cases interpreting Listing 12.05C also provide instruction on the factors that play into this determination.  For example, even though IQ range constitutes the Prong 2 determination, the actual score is often considered in conjunction with the level of adaptive functioning. *See, e.g., Conyers v. Astrue*, No. 4:11-cv-00037-D, 2012 WL 3282329, at *8 (June 29, 2012), *adopted by* 2012 WL 3283285 (E.D.N.C. Aug.10, 2012); *Holtsclaw v. Astrue*, No. 1:10-cv-199, 2011 WL 6935499, at *4 (W.D.N.C. Dec. 30, 2011) (both discussing IQ score when considering the level of adaptive functioning at the Prong 1 inquiry); *see also Norris v. Astrue*, No. 7:07-cv-184-FL, 2008 WL 4911794, at *3 (E.D.N.C. Nov.14, 2008) (noting that a diagnosis of mental retardation is possible with an IQ score of 70–75 when there are significant deficits in adaptive behavior and may not be supported even with an IQ score of below 70 when there are not significant deficits). Moreover, in the absence of any evidence of a change in the claimant's intelligence functioning, the law assumes that the claimant's IQ has remained relatively constant. *Luckey v. U.S. Dep't. Of Health and Human Servs.*, 890 F.2d

25

666, 668 (4th Cir. 1989). Similarly, a claimant's diagnosis, if there is one, is pertinent: when a claimant has been diagnosed as mildly mentally retarded in a Listing 12.05C case, courts are more likely to affirm a finding of deficits in adaptive functioning prior to age 22 than if the claimant has the lesser diagnosis of borderline intellectual functioning. *Conyers*, 2012 WL 3282329, at *9 (discussing claimant's level of adaptive functioning and noting that the claimant was classified in the low end of the spectrum of mildly mentally retarded); *Salmons*, 2012 WL 1884485, at *5 (discussing claimant's level of adaptive functioning and noting that the claimant was classified in the borderline intellectual functioning category).

Whether the claimant is illiterate is also an important factor. *See Luckey*, 890 F.2d at 668–69; *Salmons*, 2012 WL 1884485, at *7; *Holtsclaw*, 2011 WL 6935499, at *4; *Rivers*, 2011 WL 2581447, at *3–4. Similarly, whether the claimant has ever lived independently is a relevant inquiry. *Compare Salmons*, 2012 WL 1884485, at *4 with *Holtsclaw*, 2011 WL 6935499, at *5. Another guiding factor is whether the claimant has ever provided care for others, or, conversely, whether she herself is dependent on others for care. *Compare Salmons*, 2012 WL 1884485, at *7 (noting claimant was heavily dependent on his mother and was not responsible for the care or supervision of anyone else) *and Holtsclaw*, 2011 WL 6935499, at *4–5 (noting claimant had never lived independently and required a parent's help) *with Hancock*, 667 F.3d at 475–76 (affirming denial of benefits where the claimant managed the household and cared for her three young grandchildren) and *Caldwell v. Astrue*, No. 1:09-cv-233, 2011 WL 4945959, at *3 (W.D.N.C. Oct.18, 2011) (noting claimant assisted in the care of an elderly parent).

School records and past academic performance are also important indicators of deficits in adaptive functioning prior to age 22. *See Salmons*, 2012 WL 1884485, at *7 ("[F]unctional academic skills is the primary measure of deficits of adaptive functioning before age 22."); *Rivers*, 2011 WL 2581447, at *3 (noting that claimant was classified as special needs at school, had repeated evaluations in elementary school with IQ scores all in the 50s, and dropped out of school in the ninth grade); *see also Conyers*, 2012 WL 3282329, at *8–9 (discussing the claimant's school history). Additionally, work history, while it cannot preclude benefits where the Listing 12.05C criteria are otherwise met, *Luckey*, 890 F.2d at 669, can be relevant in determining whether a claimant manifested deficits in adaptive functioning prior to age 22. *Hancock*, 667 F.3d at 475–76 (concluding ALJ's finding that the claimant did not manifest requisite deficit in adaptive functioning to be supported by substantial evidence where the ALJ considered, among many other factors, that the claimant had worked several jobs); *Harts v. Astrue*, 2012 WL 529982, at *6 n. 3 (Jan. 30, 2012) (distinguishing *Luckey* because the ALJ used the claimant's work history as only one factor to support his finding of no significant deficits in adaptive functioning and because the claimant in *Harts* did not otherwise meet the Listing 12.05C criterion of a valid IQ score within the range of 60–70), adopted and incorporated in 2012 WL 529980 (D.S.C. Feb.17, 2012). Finally, the tasks a claimant is able to undertake, although not determinative, have been considered in this analysis. *See generally Radford v. Astrue*, No. 5:08-cv-421-FL, 2009 WL 1675958, at *6 (E.D.N.C. June 10, 2009) (finding that the claimant's ability to perform certain tasks was not inconsistent with mild mental retardation); *see, e.g., Hancock*, 667 F.3d at 476 & n. 3 (affirming ALJ's consideration of the claimant's ability to perform tasks such as shopping, paying bills, and making change);

27

*Salmons*, 2012 WL 1884485, at *7 (discussing claimant's inability to do household chores, cook, and drive).

Applying these factors to the record presented, the Court finds that Plaintiff has failed to show that the ALJ's determination—that she did not prove the existence of deficits in adaptive functions prior to age 22—was unsupported by substantial evidence or controlled by an error of law.   As an initial matter, the ALJ pointed out the fact that, while Plaintiff claimed to have dropped out of school in the tenth grade and reported being in special education classes and having a history of learning difficulties in school, Plaintiff failed to submit any school records for the ALJ's consideration.  [*See* R. 22.]  Additionally, the ALJ noted that Dr. Renuka Harper ("Dr. Harper"), upon examining Plaintiff, found that she was not illiterate and had basic academic skills for reading and math.  [R. 22.]  Dr. Harper diagnosed Plaintiff with borderline intellectual functioning.  [R. 678.]  A diagnosis of mental retardation would have created a presumption of deficits in adaptive functioning prior to age 22 in at least two areas.  The fact that Plaintiff was not diagnosed with mental retardation, as the ALJ points out, required Plaintiff to move forward with the production of evidence to meet her burden of showing these deficits.  While Plaintiff takes issue with the ALJ pointing out that she was not diagnosed with mental retardation, the Court finds no impermissible inference requiring remand as suggested by Plaintiff.

In addition to academic functioning, the ALJ likewise considered Plaintiff's work history as merely one factor, not the sole factor, in evaluating the presence of deficits in adaptive functioning. *See Hancock*, 667 F.3d at 475–76 (concluding that the ALJ's finding that the claimant did not manifest requisite deficit in adaptive functioning was supported by substantial evidence where the ALJ considered, among many other factors, that the

28

claimant had worked several jobs); *Harts v. Astrue*, C/A No. 0:10-1893-CMC-PJG, 2012 WL 529982, at *6 n. 3 (D.S.C. Jan. 30, 2012) (distinguishing *Luckey* because the ALJ used the claimant's work history as only one factor to support his finding of no significant deficits in adaptive functioning) (Report and Recommendation), *adopted and incorporated in* 2012 WL 529980 (D.S.C. Feb.17, 2012).

Further, the ALJ found that Plaintiff lived with her boyfriend and daughter, was able to bathe and dress independently, helped her daughter cook dinner daily, helped to babysit her grandson, shopped once a month with her boyfriend, went to church at least two Sundays a month, visited friends once a month, and used the computer twice a week for Facebook. [R. 19–20.] The ALJ concluded that Plaintiff's activities of daily life show that she has intact self-care and home living skills, she is able to navigate through everyday situations involving grooming and feeding, and she can independently perform living skills. [R. 21.] The ALJ also noted that Plaintiff maintained the ability for self-direction and could complete day-to-day tasks without guidance. [R. 22.]

Because the ALJ considered pertinent evidence and weighed appropriate factors in analyzing whether Plaintiff met the introductory requirements of Listing 12.05C, the Court cannot say that the ALJ's determination—that Plaintiff did not demonstrate the requisite deficits in adaptive functioning—was not supported by substantial evidence or was controlled by error of law. The fact that Plaintiff can point to other evidence that supports her position does not render the ALJ's decision unsupported. *See Hancock*, 667 F.3d at 476.

**Weighing of Treating Physician Opinion**

Plaintiff contends the ALJ used "inaccurate information" to discount the opinion of Dr. Davis. [Doc. 15 at 6.] Specifically, Plaintiff takes issue with the ALJ's statement that Plaintiff "didn't have a diagnosis of low back pain and didn't complain of myositis/myalgias until August of 2012 when the evidence clearly shows otherwise." [*Id.*] Plaintiff also argues that the ALJ improperly discounted Dr. Davis's opinion finding that his opinion was not supported by his own treatment records as his treatment records did not diagnosis lumbago but Dr. Davis found lumbago to be a severe limitation. [*Id*. at 7.] The Commissioner, however, argues the ALJ properly found Dr. Davis's opinion was entitled to little weight due to inconsistencies with his own findings, and inconsistencies with evidence from other medical treatment, including X-rays and other tests. [Doc. 17 at 20.]

### *Dr. Davis's Treatment Notes and Opinion*

Treatment records indicate Plaintiff was treated at Cannon Family Practice ("Cannon") in Liberty between at least November 2011 and October 2012, seeing either Nurse Diane Cobb ("Nurse Cobb") or Dr. Davis. [*See* R. 639–673.] On November 29, 2011, Plaintiff presented to Nurse Cobb with hypothyroidism (symptoms including weight gain, cold intolerance, fatigue, weakness, constipation, leg swelling, decreased appetite, hair loss, dry skin and decreased sweating), poor memory and depression, but no dysphagia, neck pain, blurred vision or decreased hearing. [R. 671.] On physical exam, Dr. Davis noted regular findings and appropriate affect for mental status. [R. 672.] On December 29, 2011, Plaintiff returned to Cannon with complaints of abdominal pain which she described as mild and crampy. [R. 669.] Plaintiff experienced nausea and vomiting and had been to the emergency room twice over the past two weeks due to vomiting and

30

pain.  [*Id*.]  X-ray results were normal.  [*Id*.]  General examination of Plaintiff's abdomen by Dr. Davis resulted in normal findings. [*Id*.]

On January 6, 2012, Plaintiff presented to Cannon complaining of a breast mass, breast pain, breast tenderness, and breast erythema.  [R. 667.]  Plaintiff's exam by Dr. Davis was normal with the exception of an inflamed area in the left breast.  [R. 668.]  Dr. Davis assessed cellulitis/abscess and prescribed Bactrim. [*Id*.]  On January 16, 2012, Plaintiff presented with a sore throat. [R. 665.]  On January 27, 2012, Plaintiff returned to Dr. Davis for a re-check of her hypothyroidism and abdominal pain.  [R. 663.]  On physical exam, Dr. Davis documented normal findings.  [R. 664.]  On February 8, 2012, Plaintiff saw Dr. Peter Schriver ("Dr. Schriver), also with Cannon, on referral from Dr. Davis for complaints of esophageal discomfort.  [R. 661.]  Notes indicate Plaintiff presented with dysphagia, including symptoms of chocking and heartburn, and difficulty or painful swallowing in the lower esophagus.  [*Id*.]   On physical exam, Dr. Schriver noted normal findings and referred Plaintiff to a astroenterologist for assessment.  [*Id*.]

On May 14, 2012, Plaintiff returned to Dr. Davis for a pap smear, feeling well but with minor complaints of some back pain, decreased energy level, sleeping poorly, and painful sexual intercourse. [R. 658.] Plaintiff reported sleeping six hours per night and decreased libido. February 9, 2016.  [*Id*.]  Plaintiff also reported appetite loss and fatigue. [R. 659.]   On examination, Dr. Davis noted normal findings and mental status exam showed Plaintiff was oriented x3 with appropriate mood and affect.  [*Id*.]

On June 20, 2012, Plaintiff returned to Cannon with acute pancreatitis and symptoms of abdominal pain, diarrhea, loss of appetite, and nausea.  [R. 655.]  On physical exam, Dr. Davis documented normal findings. [R. 656.]  On July 5, 2012, Plaintiff

saw Nurse Cobb for a recheck of her acute pancreatitis. [R. 652.]  On physical exam, Dr. Davis documented normal physical and mental findings.  [R. 653.] Dr. Davis referred Plaintiff to Dr. John Warren for follow-up and treatment. [R. 654.]

On August 23, 2012, Plaintiff returned to Cannon for a recheck of her hyperlipidemia and complaints of tingling in the bottom of her feet, especially at night.  [R. 649.]  Plaintiff also complained of back pain described as a dull ache located in the lower back.  [R. 649.] On physical exam, Dr. Davis made normal findings. [R. 650.]  On September 20, 2012, Plaintiff presented to Nurse Cobb with a complaint of burning urination with associated chills and frequency.  [R. 646.]  On physical exam, Dr. Davis noted normal findings [R. 647] and assessed Plaintiff with a urinary tract infection [R. 648].

On October 3, 2012, Plaintiff returned to Dr. Davis complaining of migraine headache, photophobia, phonophobia, and nausea.  [R. 643.]  Plaintiff reported having a bad cough that made her have a headache, and that, while her cough got better after being given cough medicine in the ER, she still had the headache.  [*Id*.]  Plaintiff also continued to complain of burning urination.  [*Id*.]  On physical exam, Dr. Davis documented normal findings. [R. 644–645.]  Dr. Davis diagnosed Dysuria. [R. 645.]

Again, on October 3, 2012, Dr. Davis completed a counsel provided Physical Questionnaire, in check-box format, indicating: Plaintiff's diagnoses included: lumbago, ovarian cyst, hypothyroidism, and fibromyalgia; positive objective signs included multiple tender points, non-restorative sleep and anxiety; factors that precipitated pain included stress; Plaintiff experienced pain or other symptoms severe enough to interfere with attention and concentration needed to perform even simple work tasks occasionally; Plaintiff could walk one or two city blocks without rest or severe pain; Plaintiff could sit 30

32

minutes before she needed to get up; Plaintiff could stand 30 minutes at a time before she needed to sit down or walk around; Plaintiff could stand/walk for 2 hours and sit for 4 hours in an 8-hour work day; Plaintiff needed to include periods of walking around during an 8-hour work day; Plaintiff needed a job that allowed her to shift positions at will from sitting, standing, or walking; Plaintiff would sometimes need to take unscheduled breaks during an 8-hour work day; with prolonged sitting, Plaintiff's legs should be elevated; Plaintiff did not require an assistive device when engaging in occasional standing or walking; Plaintiff could occasionally lift/carry 10 pounds, rarely lift/carry 20 pounds, and never lift/carry 50 pounds in a competitive work situation; Plaintiff should occasionally climb stairs, but rarely twist, stoop (bend), crouch/squat or climb ladders; Plaintiff would likely miss work more than four days per month; Plaintiff was capable of low stress jobs; emotional factors contributed to the severity of Plaintiff's symptoms and functional limitations; psychological conditions affecting Plaintiff's physical condition included depression, anxiety, and PTSD; and Plaintiff's signs and symptoms included: appetite disturbance, decreased energy, thoughts of suicide, feelings of guilt or worthlessness, generalized persistent anxiety, mood disturbance, difficulty thinking or concentrating, hallucination or delusions, easy distractibility, memory impairment, decreased need for sleep.  [R. 635–638.]

On October 23, 2012, Plaintiff returned to Dr. Davis for a recheck of her hyperlipidemia and with complaints of myalgia or dull aching pain across the back aggravated by prolonged rest (sitting too long, and getting up and moving).  [R. 640.]  On physical exam, Dr. Davis documented normal findings with an alert mental status.  [R. 641.]  Dr. Davis diagnosed Plaintiff with hyperlipidemia mixed, and myalgia/myositis not otherwise specified.  [R. 642.]

### *ALJ's Weighing of Dr. Davis's Opinion*

The ALJ explained his consideration of Dr. Davis's opinion as follows:

> I assign controlling weight to portions of Dr. Davis's opinion: that she can stand/walk for two hours in a workday and that she does not need an assistive device for occasional standing/walking. These opinions are well-supported" by "medically acceptable" clinical and laboratory diagnostic techniques and are "not inconsistent" with the other "substantial evidence" in the record.
>
> However, I cannot assign controlling weight to the remainder of his opinion because the remainder of his opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques and is inconsistent with the other substantial evidence in the case record.
>
> His own findings do not support the remainder of his opinion. He said he based his opinion on diagnoses of were lumbago, ovarian cyst, hypothyroidism and fibromyalgia. The diagnosis of lumbago does not appear elsewhere in the record and is not supported by exam and X-ray findings. Ovarian cyst and hypothyroidism have not resulted in severe functional limitations. He noted back complaints only in August and October 2012 and in August 2012, attributed back pain to possible kidney or ureter stone. He did not include fibromyalgia in his own diagnoses in his notes. He did note complaints of anxiety until August 2012.
>
> Dr. Davis's opinion is inconsistent with other substantial evidence in the record. Evidence from ER visits, Dr. Patel and Dr. Todd do not indicate such severe physical limitations as Dr. Davis described.
>
> Although I cannot assign controlling weight to Dr. Davis's opinion, under SSR 96-2p, and 20 CFR 416.927(d)(2), I must consider the following factors in weighing his opinions: treatment relationship, examining relationship, supportability, consistency and specialization. Dr. Davis has treated claimant only since 2011 and treated back pain and anxiety only since August 2012. His notes include few objective findings to support his conclusions. Therefore, I assign little weigh to the remainder of his opinion.

[R. 31.]

### *Discussion*

Plaintiff contends the ALJ failed to properly evaluate Dr. Davis's opinion under the Treating Physician and Pain rules because he used inaccurate information to do so. [Doc. 15 at 6.]  Specifically, Plaintiff points out that the ALJ improperly concluded that Plaintiff did not complain of back pain until she saw Dr. Davis in August 2012 when the evidence of record shows that she was being treated by a pain management doctor with epidural steroid injections, nerve blocks, and trigger point injections.  [*Id.*]

Upon review, the Court finds the ALJ's conclusions regarding Dr. Davis's opinion are accurate in that there is no evidence in Dr. Davis's treating records to indicate that Plaintiff complained of back pain until August 2012.  With respect to Plaintiff's treatment by pain management doctor, Dr. J. S. Patel ("Dr. Patel), the ALJ found that Dr. Davis's opinion was inconsistent with evidence provided by Dr. Patel and Dr. Rhonda Todd ("Dr. Todd"), of Pain Management Associates, which failed to indicate the severe limitations Dr. Davis described.  [R. 31.]   Records from Dr. Patel and Dr. Todd indicate Plaintiff was diagnosed with lumbar facet syndrome, lumbar spondylosis, low back pain, and sacroiliac joint dysfunction and received treatment between May 9, 2011 and March 6, 2012.  [*See* R. 427–457, 506–518.]  A report by Dr. Patel, dated June 1, 2011, showed essentially normal electrodiagnostic study of the bilateral lower extremities with some non-specific and non-conclusive abnormalities noted.  [R.  449.]  Further, as observed by the ALJ, none of the treatment notes by Dr. Patel or Dr. Todd indicated any restriction or limitations on Plaintiff's activities.  The ALJ specifically discussed Plaintiff's treatment with Dr. Patel.  [R. 24–26.] The ALJ also noted that Plaintiff has a "history of noncompliance, including failure to attend

35

prescribed physical therapy, suggesting that the symptoms are less severe than the claimant has alleged." [R. 28.]

After considering the above, the ALJ determined that Plaintiff has no limitation for sitting and could sit for up to six hours in an eight-hour workday, could stand/walk for a maximum of two hours in a workday, could lift/carry a maximum of less than 10 pounds occasionally, and was limited to sedentary exertion. [R. 29.] Plaintiff has failed to direct the Court to any evidence of record that was not considered by the ALJ, showing or suggesting Plaintiff is more limited than what was determined by the ALJ. As the ALJ pointed out, Dr. Davis's notes contain no evidence to support the severe limitations he opined, and the treatment notes of Plaintiff's pain management consultants fail to suggest any limitations in her functional abilities. Accordingly, the Court cannot find that the ALJ's weighing of the opinion evidence provided by Dr. Davis is not supported by substantial evidence.

**RFC Finding Consistent with VE Testimony**

Plaintiff argues that the ALJ failed to take into consideration the VE's testimony that Plaintiff's absences from work would exceed tolerances and make her unemployable. [Doc. 15 at 8–9.] Plaintiff contends that, while the ALJ discounted Dr. Davis's opinion that Plaintiff would miss more than four days of work per month, the ALJ failed to take into consideration Plaintiff's abdominal pain and pancreatic flair ups on her ability to work. [*Id*.] The Commissioner argues that the ALJ properly included only the limitations credibly established by the record in the RFC and his hypothetical to the VE. [Doc. 17 at 22.] The Commissioner contends Plaintiff's absences from work were not a credibly established limitation and the ALJ as not required to incorporate it into the RFC. [*Id*. at 24.]

36

Although Plaintiff presents her argument as one challenging the ALJ's finding that she could perform sedentary work given the testimony of the VE, the Plaintiff's arguments are more accurately directed to the ALJ's RFC findings and, thus, the limitations he presented to the VE for consideration. In order to consider Plaintiff's argument, the Court must review the ALJ's determination regarding Plaintiff's RFC.

### ALJ's RFC Findings

The Administration has provided a definition of residual functional capacity ("RFC") and explained what a RFC assessment accomplishes:

> RFC is what an individual can still do despite his or her limitations. RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities. Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule . . . .

SSR 96–8p, 61 Fed.Reg. 34,474–01, at 34,475 (July 2, 1996) (internal citation and footnotes omitted). The RFC assessment must first identify the claimant's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 C.F.R. 404.1545 and 416.945. *See id.* Only after this identification and assessment may RFC be expressed in terms of the exertional levels of work: sedentary, light, medium, heavy, and very heavy. Id. Additionally, the Administration has determined that in assessing RFC, the ALJ

37

> must consider only limitations and restrictions attributable to medically determinable impairments. It is incorrect to find that [a claimant] has limitations or restrictions beyond those caused by his or her medical impairment(s) including any related symptoms, such as pain, due to factors such as age or height, or whether the [claimant] had ever engaged in certain activities in his or her past relevant work (e.g., lifting heavy weights.) Age and body habitus (i .e., natural body build, physique, constitution, size, and weight, insofar as they are unrelated to the [claimant]'s medically determinable impairment(s) and related symptoms) are not factors in assessing RFC . . . .

Id. at 34,476.

To assess Plaintiff's RFC, the ALJ must consider all relevant evidence in the record, including medical history, medical signs, laboratory findings, lay evidence, and medical source statements.  Thus, an ALJ's RFC assessment will necessarily entail assessing the credibility of any alleged limitations, including assessing the credibility of testimony offered by the claimant.

In the instant action, the ALJ states that, in making the RFC determination, he carefully considered the:

> all symptoms and the extent to which these symptom can reasonably be accepted as consistent with the objective medical evidence and other evidence based on the requirements of 20 CFR 416.929 and SSRs 96-4p and 96-7p. I have also considered opinion evidence in accordance with the requirements of 20 CPR 416 927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p.

[R. 24.]

With respect to Plaintiff's claims that she suffers from pancreatitis flare-up once a month, stays in bed for days without bathing, has migraines twice a month, elevates her legs six hours a day due to swelling, and suffers from severe abdominal pain requiring numerous emergency room visits [*see* Doc. 15 at 8], the ALJ specifically addressed his

consideration of these impairments finding them non-severe, resulting in no significant

work-related limitations.  For instance, the ALJ found that

> From June 4 to June 8, 2012, she had ER and inpatient treatment for acute pancreatitis and dehydration. New abdominal CT showed no change since 2010. Although the diagnosis of chronic obstructive pulmonary disease (COPD) does not appear elsewhere in the record, ER history referred to her having "COPD on CPAP at night." Apparently, this was a reference to sleep apnea (discussed below). She gave history of kidney stones, but again, I find no other reference to her having kidney stones since the alleged onset date. Doctors noted a history of noncompliance. ER evaluation showed elevated serum lipase level elevated above 2000. CT of abdomen and pelvis revealed no kidney stones. She said pain had improved but she continued to have some pain. The only medication prescribed upon discharge was Phenergan for nausea/vomiting (Exhibit 15F).
>
> When she came to the ER with similar symptoms on June 24, 2012, she was diagnosed only with abdominal pain and had urine drug screen that was positive for THC (marijuana). When she returned to the ER in July 2012, ER physicians diagnosed only gastroenteritis and gave Phenergan for vomiting (Exhibit 15F).
>
> Claimant testified that along with depression, pancreatitis is one of her most severe impairments. She admitted that pancreatitis was not diagnosed until June 2012. She said it causes vomiting, diarrhea and abdominal pain, but she treats it only with diet by avoiding fatty foods and fried foods.  She said she takes Nexium for acids in the stomach, but I note that Nexium was prescribed for reflux symptoms rather than for pancreatitis. I find little evidence that pancreatitis results in significant work-related limitations.
> ...
>
> In November 2011 with Dr. Davis, she gave history that included migraine headaches, but I find no evidence that she sought treatment for migraine headaches outside the ER or that headaches have significantly affected work-related activities.

> These impairments do not significantly limit claimant's ability to perform basic work activities. The impairments are "not severe" because medical and other evidence establishes only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on claimant's ability to work (20 CFR 416.921 and Social Security Rulings (SSRs) 85-28, 96-3p, and 96-4p ).

> She testified that she has leg pain, but admitted that doctors cannot find a cause for the pain. She said it might be due to restless leg syndrome; however, I find no such diagnosis in the record and find no evidence of a medically determinable impairment of restless leg syndrome.

[R. 15–16.]  The ALJ likewise found Plaintiff's mental impairments non-severe upon considering Listings 12.03, 12.04, 12.05, 12.06, 12.08, and 12.09. [R. 17–23.]

Upon addressing Plaintiff's RFC, the ALJ took into consideration Plaintiff's physical and mental impairments [R. 24–27], and determined that

> Considering all the evidence, including evidence obtained from medical sources both before and after the hearing and evidence discussed in evaluation of the "B" and "D" criteria, I find claimant is not as limited in activities of daily living as she alleged in testimony. I find she engages in a range of daily activities consistent with a capacity for sedentary exertion with the additional limitations I have set forth.

[R. 27.] The ALJ considered Plaintiff's allegation that her legs swell if she does not elevate them for six hours a day but noted that "she could not state why her legs swell and I find no evidence of a medically determinable impairment that would account for this symptom." [R. 28.] The ALJ also noted Plaintiff testified that she has taken medication for depression and implied that she currently "attends mental health," but he could find no record of treatment since June 2012 and that, in fact, she was discharged from Pickens County Mental Health Center on July 25, 2012 for failure to pursue treatment.  [*Id*.]  The ALJ also took into consideration Plaintiff's "history of noncompliance, including failure to attend

40

prescribed physical therapy, suggesting that the symptoms are less severe than the claimant has alleged. The record also reveals that treatment has been generally successful in controlling her symptoms." [*Id.*]

### Discussion

As stated previously, the Court's review is limited to determining whether the ALJ's findings are supported by substantial evidence and whether the correct law was applied. In this case, the Court finds no error.

Upon review, the Court finds the ALJ's decision summarizes and discusses the medical records and objective medical evidence presented, explains his weighing of opinion evidence, and discusses his consideration of non-medical evidence examined in determining Plaintiff's functional limitations.  In addition to highlighting the substantial evidence that exists to support his RFC determination, the ALJ's discussion and analysis also explain why he assessed Plaintiff with those particular limitations. In sum, the ALJ's decision logically explains how he determined Plaintiff's RFC—a determination expressly reserved for the ALJ—and Plaintiff has failed to address how the ALJ's RFC assessment is contrary to any evidence of record.  Accordingly, the ALJ's decision with respect to the RFC assessment is supported by substantial evidence.  Because his RFC assessment is supported by substantial evidence, the ALJ's hypothetical to the VE based on the limitations included in the RFC was proper.  *Torres v. Astrue*, No. 07-2865, 2009 WL 873995, at *8 (D.S.C. Mar. 30, 2009) (unpublished) ("the hypothetical only needs to include all of the claimant's credible impairments.  Accordingly, if the record does not support the existence of a limitation, the ALJ need not include it in the hypothetical question.")

## CONCLUSION AND RECOMMENDATION

Wherefore, based upon the foregoing, it is ordered that the Commissioner's decision be AFFIRMED.

**IT IS SO ORDERED**.


s/Jacquelyn D. Austin
United States Magistrate Judge

February 8, 2016
Greenville, South Carolina